IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **PRAIRIE PETFOOD INGREDIENTS,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| **HUBBARD INGREDIENTS, LLC;** | § | Civil Action No. **3:21-CV-205-L** |
| **INTEGRATED PROTEINS, LLC; and** | § | |
| **JOSEPH HUBBARD,** | § | |
| | § | |
| Defendants and Counter Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| **PRAIRIE PETFOOD INGREDIENTS;** | § | |
| **OPEN RANGE AGRICULTURE, LLC;** | § | |
| **THOMAS OLIVER HARWELL; and** | § | |
| **COLLIN HARWELL,** | § | |
| | § | |
| Counter Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court are the Amended Motion for Partial Summary Judgment filed by Defendant Hubbard Ingredients, LLC (Doc. 108); and Plaintiff's and Counter Defendants' Motion for Partial Summary Judgment (Doc. 111).[1] After considering the Motions, briefs, evidence, pleadings, and applicable law, the court **grants in part and denies in part** both Motions (Docs. 108, 111).

---

[1] For simplicity purposes, the court refers to the summary judgment motions filed by the parties as "Motion" or "Motion for Summary Judgment." Whether the court's reference to "Motion" or "Motion for Summary Judgment" refers to that by Hubbard or Plaintiff/Counter Defendants will be apparent from the context of the undersigned's discussion in this memorandum opinion and order in which the parties' Motions are addressed separately.

**Memorandum Opinion and Order – Page 1**

I.      **Factual and Procedural Background**

The parties to this action have filed a number of contractual, statutory, and tort-based legal claims against one another, as well as equitable claims.[2]  At the heart of this action, though, is a contract dispute between Prairie Petfood Ingredients, LLC ("Plaintiff" or "PPI") and Hubbard Ingredients, LLC ("Hubbard," "Hubbard Ingredients," or "HI").  PPI is a supplier of various types of protein meal within the United States that is used in the pet food ingredients industry to manufacture pet food.  Hubbard specializes in providing domestic brokers, distributors, and pet food manufacturers with access to international suppliers of pet food ingredients, including protein meals.

In 2015, PPI and Hubbard entered into a Sourcing Agreement in which PPI agreed to pay Hubbard 40% of the "Gross Margin" or profit that PPI made on sales of "Product"[3] procured or sourced by Hubbard using its international supply chain.  In this regard, the Sourcing Agreement provides that "Contractor [Hubbard] agrees to use his knowledge, abilities, professional contacts, his unique expertise in the industry, and his best efforts to provide PPI with access to imported materials ('Product') that PPI would otherwise be unable to obtain." Doc. 113 at 5.  The Sourcing Agreement further provides that "[i]n the course of assisting PPI in obtaining such Product, Contractor [Hubbard] further agrees to arrange for the inbound and outbound freight of the above Product, and will have such Product delivered to PPI." *Id.*  The Sourcing Agreement defines "Gross Margin" as "the profit made by the sale of the Product, less inbound and outbound shipping costs." *Id.* at 8.

---

[2] Unless otherwise indicated, the facts referenced in the memorandum opinion and order are undisputed.

[3] As the Sourcing Agreement capitalizes the term "Product," the court similarly capitalizes this term when referring to "Product" as used in the parties' agreements, that is, "Product" that Hubbard obtained and delivered to PPI pursuant to the parties' agreements. References herein to "product" on the other hand, refers to product that PPI sourced on its own rather than through Hubbard, or "product" other than that contemplated by the parties' agreements.

**Memorandum Opinion and Order – Page 2**

Between late October 2019 and mid-Defendant 2019, the parties discussed an arrangement that would increase Hubbard's commissions. By December 19, 2019, PPI and Hubbard had negotiated a Sales Compensation Plan that modified the Sourcing Agreement by providing Hubbard with an additional 10% of the gross profit dollars PPI made on "sales of product procured by Hubbard" *and* sold by PPI to "customers introduced by Hubbard." Doc. 122 at 20. PPI's and Hubbard's agreement in this regard was memorialized in e-mails, and the parties thereafter began operating in accordance with this agreement. A short time later and continuing throughout 2020, the parties' business relationship and trust for one another steadily eroded.

In early 2020, PPI learned that Hubbard had opened its own facility to sell petfood products in competition with PPI. PPI initially took the position in this action that such conduct by Hubbard breached the parties' agreements or what it referred to as the parties' "Joint Venture," but it later withdrew its claim for breach of contract based on this theory. Counter Defendants now contend that, upon learning of Hubbard's competing business and realizing that Hubbard did not share PPI's respect for their business relationship, PPI was entitled to terminate and did terminate its contractual relationship with Hubbard such that it was no longer bound by the terms of either of the parties' agreements.

The Sourcing Agreement includes a provision requiring that notice of termination be provided in writing. PPI, however, never provided Hubbard with written notice of its intent to terminate the parties' agreements or business relationship, and there is no indication that it ever notified Hubbard verbally of its intent to terminate the parties' agreements.[4] Although PPI

---

[4] As herein noted, Counter Defendants assert that, if necessary, they will present evidence at trial that "Collin Harwell did terminate the parties' agreements (except as to subsequent shipments fulfilling existing commitments) by telling Joseph Hubbard in an early 2020 phone call that Hubbard Ingredients' conduct was 'going to destroy and end this relationship." Doc. 136 at 20. Counter Defendants' assertion that it will come forward with evidence at trial does not constitute evidence for summary judgment purposes.

**Memorandum Opinion and Order – Page 3**

contends that it terminated the parties' agreements, PPI admits that it continued to operate under both agreements, although only to the extent that it anticipated some previously arranged outstanding shipments of Product by Hubbard. PPI also admits that it stopped paying commissions to Hubbard in July 2020.

In addition, PPI started sourcing product on its own without the assistance of Hubbard and began selling the product it sourced to Hubbard's customers without Hubbard's knowledge. PPI contends that its decisions to stop paying commissions to Hubbard, to start sourcing product without Hubbard's assistance, and to sell product to Hubbard's customers were justified because, after Hubbard opened a competing business, it was left with large quantities of previously ordered and purchased product that it had to sell at a loss. PPI contends that it brought this lawsuit "to recover losses on [the] fire-sale disposition of [P]roduct that had been intended for sale to customers whose needs were instead surreptitiously filled by Hubbard from its new facility." Doc. 112 at 3.

By April 2020, Hubbard was becoming concerned that PPI was not calculating commissions in accordance with the parties' agreements. Hubbard consequently believed that PPI was underpaying commissions. When Hubbard inquired about this concern, PPI responded that commissions were being paid as agreed. PPI also assured Hubbard that commission payments would be forthcoming. Within the company, though, PPI made the decision in July 2020 to stop paying commissions. Hubbard contends that PPI breached the parties' agreements in July 2020 when it ceased paying commissions, and that PPI did so without first providing written notice of termination as required by the Sourcing Agreement.

The parties disagree how commissions should be realized under their agreements. PPI muddies the waters by focusing on what it refers to as Hubbard's claims for "post-termination

**Memorandum Opinion and Order – Page 4**

commissions." This aside, the essence of PPI's argument is that Hubbard's entitlement to commissions should be limited to those sales for which Hubbard procured the Product sold by PPI.

Hubbard, on the other hand, contends that it is entitled to commissions on all sales by PPI, regardless of whether it procured the product for the sales, because it developed the international supply chain through which PPI was able to obtain and sell product to its customers and Hubbard's customers. Hubbard, therefore, contends that PPI breached the parties' contracts by failing to pay owed commissions and the other reasons summarized below:

> i. Failing to pay Hubbard Ingredients commissions to which Hubbard Ingredients was entitled for sourcing [P]roduct for PPI;
>
> ii. Failing to pay Hubbard Ingredients commissions to which Hubbard Ingredients was entitled for direct sales made by Hubbard Ingredients to its customers;
>
> iii. Allocating ingredients sourced by Hubbard Ingredients to low-margin contracts when calculating commissions as a way of manipulating commissions downward;
>
> iv. Allocating ingredients sourced by Hubbard Ingredients away from servicing direct sales made by Hubbard Ingredients as a way of manipulating commissions downward;
>
> v. Diverting ingredients sourced by Hubbard Ingredients which were designated for use to fulfill direct sales made by Hubbard Ingredients to instead fulfill sales to PPI's and ORA's customers;
>
> vi. Diverting ingredients sourced by Hubbard Ingredients which were designated for use to fulfill direct sales made by Hubbard Ingredients to instead be sold by Counterclaim Defendants on the so-called "spot market";
>
> vii. Attempting to circumvent, and in some cases actually circumventing, Hubbard Ingredients by impermissibly contacting Hubbard Ingredients' suppliers and surreptitiously ordering product, including those referenced expressly in the Sales Compensation Plan, without the knowledge or consent of and without compensating Hubbard Ingredients as required by the contracts between the parties;
>
> viii. Attempting to circumvent, and in some cases actually circumventing, Hubbard Ingredients by impermissibly contacting and selling ingredients to

**Memorandum Opinion and Order – Page 5**

Hubbard Ingredients' customers, including those referenced expressly in the Sales Compensation Plan, without the knowledge or consent of and without compensating Hubbard Ingredients as required by the contracts between the parties;

ix. Failing to furnish records to Hubbard Ingredients sufficient to permit Hubbard Ingredients to verify its commissions;

x. Improperly deducting amounts from commissions paid to Hubbard Ingredients for alleged chargebacks, product shrinkage;

xi. Improperly deducting its losses from Hubbard Ingredients' sourcing commissions, (ECF 13, 1st Am. Compl. at ¶ 10);

xii. Overcharging Hubbard Ingredients for freight from the port of Houston to Defendants' facility; and

xiii. Securing Hubbard Ingredients' continued performance under the Sourcing Agreement and Sales Compensation Plan by promising to pay outstanding commissions due to Hubbard Ingredients while not paying those outstanding commissions.

Doc. 33 ¶ 69.

Hubbard asserts that it has suffered the following damages as a result of PPI's alleged contractual breaches:

Hubbard Ingredients has sustained monetary damages as a consequence of PPI's repeated breaches of the Sourcing Agreement and the Sales Compensation Plan, including, but not limited to, unpaid commissions owed by Counterclaim Defendants to Hubbard Ingredients, commission amounts that were miscalculated or manipulated downward by Counterclaim Defendants, efforts undertaken by Hubbard Ingredients to protect its supplier relationships from Counterclaim Defendants' attempts to steal those relationships, efforts undertaken by Hubbard Ingredients to protect its customer relationships from Counterclaim Defendants' attempts to steal those relationships, lost customer relationships, moneys Hubbard Ingredients expended to locate and replace product that Counterclaim Defendants diverted [that was] needed to satisfy Hubbard Ingredients' customers, and commissions that Hubbard Ingredients would have earned and collected in the future but for PPI's breach of contract.

*Id.* ¶ 70.

PPI sued Hubbard Ingredients in state court in November 2020. PPI also sued Joseph Hubbard, Hubbard's chief executive officer, and Integrated Proteins, LLC ("Integrated Proteins"),

a company formed by Hubbard in early 2019.  The court refers to Hubbard, Joseph Hubbard, and Integrated Proteins collectively as "Defendants."

The case was removed to federal court by Defendants based on diversity jurisdiction.  In its Second Amended Complaint ("Complaint") (Doc. 31), Plaintiff asserts the following causes of action and requests for relief under Texas law: (1) breach of contract against Hubbard Ingredients; (2) fraud/fraudulent inducement against Hubbard Ingredients and Joseph Hubbard; (3) fraud by nondisclosure against Hubbard Ingredients and Joseph Hubbard; (4) a declaratory judgment that Hubbard Ingredients materially breached the "contract" by fraudulently inducing PPI, such that PPI was released from any further contractual obligations, including paying owed commissions; (5) money had and received; (6) unjust enrichment; and (7) breach of fiduciary duty.  PPI also requests attorney's fees pursuant to Texas Civil Practice and Remedies Code § 38.001. In responding to Hubbard's Motion for Summary Judgment, however, PPI advised the court that it was withdrawing its claims for breach of contract and breach of fiduciary duty.[5]  It now contends

---

[5] PPI does not state the legal basis that would allow it to voluntarily withdraw these claims. As Defendants previously filed an Answer in this action after the court denied its Motion to Dismiss, and the October 7, 2022 deadline set by the undersigned for pleading amendments has long since expired, PPI cannot amend its pleadings under Federal Rule of Civil Procedure 15(a) without first establishing good cause to do so under Federal Rule of Civil Procedure 16(b) and consent of Defendants or the court, even if only to do so to voluntarily withdraw certain claims. Moreover, Plaintiff has not shown good cause or attempted to explain why it should be allowed to amend its pleadings for this purpose after Defendants moved for summary judgment on these claims. Dismissal of the claims is also improper under Federal Rule of Civil Procedure 41. Voluntary dismissals under Rule 41(a)(1)(A)(i) "require no judicial action or approval and are effective automatically upon filing." *Yesh Music v. Lakewood Church*, 727 F.3d 356, 361 (5th Cir. 2013) (citation omitted). Thus, Rule 41(a)(1) "on its face grants a plaintiff an unconditional right to dismiss [its] complaint by notice and without order of the court at any time prior to the defendant's service of an answer or motion for summary judgment." *Id.* at 359 (citation omitted). Unless stated otherwise, voluntary dismissals under Rule 41(a)(1) are presumed to be without prejudice the first time a plaintiff voluntarily dismisses his claims. *Id.* Rule 41(a), however, expressly applies to "actions," not claims.  Fed. R. Civ. P. 41(a). The Fifth Circuit has, nevertheless, held that Rule 41(a) "allow[s] full dismissals of all claims against a defendant [under this rule] even when other defendants remained in the suit," but it cannot be used "to dismiss only some claims a plaintiff has against a defendant." *CBX Res., LLC v. ACE Am. Ins. Co.*, 959 F.3d 175, 177 (5th Cir. 2020) (citations omitted); *Williams v. Seidenbach*, 958 F.3d 341, 344-45 (5th Cir. 2020) (en banc) (same). Accordingly, dismissal or withdrawal of PPI's claims for breach of contract and breach of fiduciary duty, even if voluntary, cannot be accomplished under Rule 41(a) such that its alleged withdrawal of these claims in response to Defendants' Motion for Summary Judgment is not effective and did not result in the withdrawal or dismissal of the claims. Further, for the reasons herein explained, the court agrees with Defendants that these claims should be dismissed with prejudice.

**Memorandum Opinion and Order – Page 7**

that the facts supporting its withdrawn contract claim support the tort and equitable claims asserted by it in this action.

Defendants have asserted a handful of affirmative defenses. In addition, Hubbard asserted counterclaims against PPI and impleaded third-party defendants Open Range Agriculture, LLC ("Open Range" or "ORA"), Thomas Oliver Harwell ("Ollie Harwell"), and Collin Harwell. ORA is an entity related to PPI. Ollie and Thomas Harwell operate PPI. Defendants refer to Hubbard's claims against PPI, ORA, and the Harwells as "counterclaims" even though technically only the claims against Plaintiff PPI qualify as counterclaims. In any event, for ease of reference, the court refers to PPI, ORA, and the Harwells collectively as "Counter Defendants."

Hubbard Ingredients' claims against Counter Defendants include those for: account stated against PPI (Count I); breach of contract against PPI with respect to product sourced by PPI and Product sourced by Hubbard Ingredients on behalf of PPI (Count II); fraudulent misrepresentation against all Counter Defendants (Count III); negligent misrepresentation against PPI and ORA (Count IV); intentional interference with contract and business relationships with respect to Hubbard's suppliers against all Counter Defendants (Count V); intentional interference with contract and business relationships with respect to Hubbard Ingredients' customers against all Counter Defendants (Count VI); violation of the Missouri Commissions Sales Act against PPI and ORA (Count VII); violation of the Texas Sales Representatives Act against PPI and ORA (Count VIII); money had and received and unjust enrichment against all Counter Defendants (Count IX); and violation of the Texas Theft Liability Act against PPI (Count X). Hubbard Ingredients also seeks an award of attorney's fees against all Counter Defendants pursuant to section 38.002 of the Texas Civil Practice and Remedies Code. In response to these claims, Counter Defendants asserted a number of affirmative defenses.

In May 2024, Defendants moved to compel Counter Defendants to produce discovery and requested that Counter Defendants be sanctioned for discovery abuses, including the imposition of litigation-ending sanctions. Docs. 95, 97. On August 29, 2024, the magistrate judge entered an order on the Motion to Compel; agreed that Counter Defendants' objections to Defendants' discovery requests were not "substantially justified"; ordered them to produce documents and amend their answers to certain discovery requests by September 9, 2024; and concluded that Defendants were entitled to an award of attorney's fees, the amount of which would be determined at a later date. By separate order, the magistrate judge denied Defendants' Motion for Sanctions in the form of litigation ending or death penalty sanctions. Doc. 171.

Shortly after Defendants filed their motions to compel and for sanctions, both parties moved for partial summary judgment on May 30, 2024. Briefing on these Motions was complete by July 12, 2024. The court addresses each summary judgment motion separately.

## II.    Motion for Summary Judgment Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment.

**Memorandum Opinion and Order – Page 9**

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support one or more elements of the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence to establish the existence of a genuine dispute of material fact with respect to those elements. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude

**Memorandum Opinion and Order – Page 10**

the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id*. If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23. "Whe[n], as here, parties have filed cross-motions for summary judgment, each motion must be considered separately because each movant bears the burden of showing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law." *Shaw Constructors v. ICF Kaiser Engr's, Inc*., 395 F.3d 533, 538-39 (5th Cir. 2004).

## III.    Counter Defendants' Motion Regarding Hubbard Ingredients' Counterclaims

Counter Defendants move for summary judgment on Hubbard Ingredients' claims for: (1) payments of commissions on product not sourced by Hubbard— whether styled as account stated, breach of contract, statutory commission claims, or quantum meruit (Counts I-II and VII-IX); fraudulent and negligent misrepresentation (Counts III and IV); and intentional interference with contracts and business relationships (Counts V and VI). With respect to all of these grounds, Hubbard contends for procedural reasons that Counter Defendants are not entitled to summary judgment. The court addresses these procedural arguments first before moving on to the parties' substantive arguments regarding Hubbard's counterclaims.

### A.    Hubbard Ingredients' Procedural Arguments in Opposition to Counter Defendants' Motion for Summary Judgment

With respect to all of Counter Defendants' grounds for summary judgment in their Motion, Hubbard Ingredients contends that: (1) Counter Defendants fail to identify the elements of the causes of action for which they seek summary judgment as required by Local Civil Rule 56.3; (2) they do not support their Motion with evidence; and (3) their Motion is improper given their

**Memorandum Opinion and Order – Page 11**

discovery misconduct and incomplete document productions, which was the subject of their request to compel discovery and litigation-ending sanctions.

### 1. Compliance With Local Civil Rule 56.3

Hubbard Ingredients contends that, except with respect to its claim for tortious interference with contractual and business relations, Counter Defendants' fail to identify "concisely the elements of each claim or defense [of Defendants] [for] which summary judgment is sought" as required by Local Civil Rule 56.3. Doc. 121 at 17 (footnote omitted). As a result, Hubbard Ingredients asserts that "they leave Hubbard Ingredients and the [c]ourt in the dark about the application of their various arguments," and "Hubbard Ingredients' ability to prepare a targeted, efficient response" is "hindered." *Id.* According to Hubbard Ingredients, "[b]y ignoring the elements of [its] causes of action, Counter[] Defendants cannot show there is no genuine dispute of material fact as to any element." *Id.* Hubbard Ingredients contends that, for this reason alone, the court should deny Counter Defendants' Motion.

Regarding the content of a motion for summary judgment, Local Rule 56.3 states:

a. Except as provided in subsection (b) of this rule, a motion for summary judgment must, in addition to the contents required by Fed. R. Civ. P. 56(a),

1. on the first page, under the heading "summary," state concisely the elements of each claim or defense as to which summary judgment is sought, and
2. if the motion is accompanied by an appendix and it is necessary to cite support for an assertion about the absence or presence of a genuine dispute of fact, comply with LR 56.5(c).

b. A moving party may satisfy the requirements of subsection (a) of this rule by stating in its motion that each of the required matters will be set forth in the party's brief.

L. R. 56.3 (a)-(b).

Counter Defendants did not respond to this argument, but their Motion for Summary Judgment (Doc. 111) includes the following statement: "Each of the matters required in Local Rule

**Memorandum Opinion and Order – Page 12**

56.3 will be set forth in [their] Brief in Support, filed concurrently herewith." Counter Defendants'

summary judgment brief also identifies the precise factual and legal grounds on which summary

judgment is sought as a matter of law with respect to Hubbard Ingredients' claims.   Counter

Defendants' analysis could have been a little more thorough and better organized, but this is not a

situation in which the moving party has merely made a conclusory statement that the other party

has no evidence to prove his case.   *See Ruiz v. Bank of Am., N.A.*, No. 3:18-CV-2707-L, 2021 WL

9145416, at *4-5 (N.D. Tex. Feb. 2, 2021) (discussing the summary judgment procedure under

Rule 56, as amended in 2010 and as explained by the Fifth Circuit in *Fret v. Melton Truck Lines*,

Inc., 706 F. App'x 824, 827-28 (5th Cir. 2017), and *Austin v. Kroger Tex. L.P.*, 864 F.3d 326, 335-

36 (5th Cir. 2017)).   Accordingly, this argument by Hubbard Ingredients does not preclude the

court from reaching the merits of Counter Defendants' Motion for Summary Judgment.

### 2.   Evidence to Support Motion

Hubbard Ingredients next contends that, "[e]ven if the [c]ourt considers the merits of

Counter[] Defendants' Motion, by not presenting evidence supporting their Motion, [they] cannot

establish uncontested facts entitling them to judgment as a matter of law."   Doc. 121 at 17.

According to Hubbard, the law requires the moving party to "at least identify portions of the record

that demonstrate an absence of evidence."   *Id.* (quoting *Seastrunk v. Darwell Integrated Tech.*, No.

3:05-CV-0531, 2008 WL 190316, at *2-3 (N.D. Tex. Jan. 22, 2008) (slip op.)).   Hubbard asserts

that it is for this reason that the Fifth Circuit in *Ashe v. Corley* affirmed the denial of a motion for

summary judgment because the movant:

> "totally failed to satisfy [its] burden. . . [by] fail[ing] to point out an absence of
> proof on any factual issue . . . [and] fail[ing] to raise any factual issues at all, other
> than in the most conclusory terms. [A] mere conclusory statement that the other
> side has no evidence is not enough to satisfy a movant's burden."

Doc. 121 at 17-18 (quoting *Ashe v. Corley*, 992 F.2d 540, 544 (5th Cir. 1993); and citing *Thomas v. Abbott*, No. 4:08-CV-208, 2009 WL 900740, at *2 (E.D. Tex. Mar. 30, 2009) ("Because the Attorney General failed to identify those portions of the record which demonstrate the absence of a genuine issue of material fact, the Attorney General has failed to meet his summary judgment burden."). Defendants argue that Counter Defendants similarly "attempt to support their Motion with little more than conclusory, unsubstantiated assertions." Doc. 121 at 18.

All of the cases relied on by Hubbard predate the 2010 amendments to Federal Rule of Civil Procedure Rule 56. Additionally, as already explained, this is not a situation in which the moving party has merely made a conclusory statement that the other party has no evidence to prove his case. Accordingly, this argument by Hubbard Ingredients is misplaced and does not justify the outright denial of Counter Defendants' Motion for Summary Judgment.

### 3. Discovery Misconduct

Finally, Hubbard argues that, because Counter Defendants failed to produce documents responsive to their discovery requests and provided deficient interrogatory responses that are relevant to the claims on which summary judgment is now sought, Counter Defendants' Motion for Summary Judgment should be denied because "[f]airness entitles Hubbard Ingredients to the benefit of all responsive documents, follow-up discovery, and full compliance by Counter[] Defendants before the Court renders judgment on the counterclaims." Doc. 121 at 20.

The court is aware that Hubbard Ingredients filed a Motion to Compel and Defendants filed a Motion for Sanctions with respect to the aforementioned discovery matters. As noted, the Motion for Sanctions was denied, whereas the Motion to Compel was granted to the extent that the magistrate judge found that certain discovery responses and objections by Counter Defendants were "not substantially justified," ordered Counter Defendants to produce documents and amend

**Memorandum Opinion and Order – Page 14**

interrogatory responses by September 9, 2024, and determined that Defendants were entitled to attorney's fees.  If it is Hubbard's position, however, that it lacks sufficient evidence to respond to Counter Defendants' Motion for Summary Judgment because of Counter Defendants' failure to issue litigation holds and produce documents responsive to discovery requests, it should have sought relief under Federal Rule of Civil Procedure 56(d).

This rule allows a district court to defer ruling on a summary judgment motion, deny a summary judgment motion, provide the nonmovant with additional time to conduct discovery or prepare affidavits/declarations, or issue any other appropriate order. As Hubbard Ingredients has not shown—by declaration or affidavit that it cannot, for specified reasons, present facts essential to justify its opposition to Counter Defendants' Motion for Summary Judgment—as required by Rule 56(d), it is not entitled to denial of Counter Defendants' Motion for Summary Judgment or any other relief that the undersigned has authority to grant under this rule.  *See* Fed. R. Civ. P. 56(d).  Hubbard Ingredients' global assertion that Counter Defendants failed to comply with their discovery obligations in this litigation is not enough to satisfy Rule 56(d)'s requirements.  This is so even though the magistrate judge granted Defendants' Motion to Compel to the extent indicated.

Additionally, while Hubbard Ingredients refers to Defendants' Motion for Sanctions in responding to Counter Defendants' Motion for Summary Judgment, it does not contend, and it has not shown that Counter Defendants should be precluded under Federal Rule of Civil Procedure 37 from now relying on evidence that should have been but was not produced or disclosed. Regarding this issue, the magistrate judge determined in ruling on the Motion for Sanctions:

> that neither the requested evidence-barring sanction nor the requested facts-deemed-established sanction would be "the least severe sanction under these circumstances to carry out Rule 37(b)(2)'s [and Rule 37(c)(1)'s] purposes, which is the required standard." *Quantas Healthcare Mgmt., LLC v. Sun City Emergency Room, LLC*, No. 3:23-cv-891-K, Dkt. No. 119 at 5 (N.D. Tex. June 25, 2024). At most, under the circumstances, the least severe sanction—fees caused by the

alleged Rule 37(b)(2) violation—would again be duplicative of what the Court has already imposed under Rule 37(a)(5).

Finally, "[t]he threshold for the use of the inherent power sanction is high." *Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir. 1996). Having determined that no sanction beyond the award of attorneys' fees that the Court has imposed under Rule 37(a)(5) are appropriate under Rules 26(g)(3), 37(b), or 37(c), the Court cannot find that any additional or greater sanctions are warranted under the Court's inherent powers based on Hubbard's allegations.

Doc. 171 at 6. The court realizes that Hubbard Ingredients' response to Plaintiff's/Counter Defendants Motion for Summary Judgment was filed before the magistrate judge ruled on the Motion for Sanctions. Defendants, however, did not object to this ruling by the magistrate judge, so there is no reason or justification for the court to revisit this issue or the magistrate judge's ruling in deciding Counter Defendants Motion for Summary Judgment.

Accordingly, for these reasons, Hubbard Ingredients' reliance on Defendants' Motion for Sanctions and its argument that—Counter Defendants' Motion for Summary Judgment should be denied because "[f]airness entitles Hubbard Ingredients to the benefit of all responsive documents, follow-up discovery, and full compliance by Counter[] Defendants before the Court renders judgment on the counterclaims" (Doc. 121 at 20)—are unavailing, as Hubbard Ingredients **waived or forfeited** any argument it may have had under Rule 37 by not objecting to the magistrate judge's ruling,[6] and it has not met its burden under Rule 56(d).

---

[6] *See Lehmann v. GE Glob. Ins. Holding Corp*., 524 F.3d 621, 624 n.4 (5th Cir. 2008) (concluding that the plaintiff waived any challenge it may have had to the magistrate judge's denial of a motion to amend by failing to appeal the magistrate judge's ruling to the district court) (citations omitted).

**Memorandum Opinion and Order – Page 16**

**B. Hubbard's Claims to Recover Commissions for Product *Sourced by PPI* (Counts I, II, VII-IX)**

Although Hubbard Ingredients' claims to recover commissions based on various theories are not limited to those for product sourced by PPI, the court's discussion in this section is limited to such commissions because Counter Defendants' Motion focuses on this issue.

### 1. Plaintiff/Counter Defendants' Contentions

Counter Defendants move for summary judgment on Hubbard's claims against PPI for "post-termination commissions on sales of product not obtained through Hubbard—whether styled as account stated, breach of contract, statutory commission claims, or quantum meruit (Counts I-II and VII-IX)." Doc. 112 at 15. Counter Defendants concede that PPI owes Hubbard Ingredients some amount for commissions on sales of Product sourced or brokered by Hubbard Ingredients, but they contend that Hubbard Ingredients' claims for commissions on sales of product sourced by PPI contradict the unambiguous language in the parties' agreements and fail as a matter of law for this and other reasons:

> PPI owed and paid commissions to Hubbard, during the duration of the Parties' contractual relationship and even thereafter, on sales of [P]roduct sourced by Hubbard on PPI's behalf. Among other claims, Hubbard asserts that PPI miscalculated and underpaid commissions on such sales; on review of its records, PPI has acknowledged certain errors and resulting underpayments—although not in agreement with Hubbard as to the amounts—and will expect to make up the underpayments in the ultimate resolution of this dispute.

> However, Hubbard has also asserted breathtaking damage claims measured by its commission percentage on sales of product *not* sourced by Hubbard. The largest single element of Hubbard's claim is for commissions on sales made after the Parties' relationship had ended, for sales of product *not* sourced by Hubbard. Defendants' and Counterclaim Plaintiff's Disclosures reveal that Hubbard's exorbitant $12.7 million damage claim includes a staggering "$5,815,822.90 in damages related to unpaid commissions after PPI and/or Open Range's July 2020 cessation of commission payments." The expert designated by Defendants and Counterclaim Plaintiff to testify to such damages among others is Defendant Integrated Proteins' President, Charlie Hubbard. When deposed as a Rule 30(b)(6) representative of Hubbard, Charlie Hubbard admitted that this claim consists of

**Memorandum Opinion and Order – Page 17**

"items that Prairie imported without [Hubbard's] direct participation," and that "these are not items that [Hubbard] helped to arrange directly." In other words, Counterclaim Plaintiff Hubbard seeks almost $6 million as hypothetical commissions on PPI sales for which Hubbard played no part; it did not contact the supplier on behalf of PPI, or handle the import/export documentation, or arrange the shipment of the meal to PPI.

The problem with Hubbard's remarkable claim is that neither the Sourcing Agreement nor the Sales Compensation Agreement entitle[s]Hubbard to compensation for sales other than of [P]roduct brokered by Hubbard[.]

Doc. 112 at 11-12 (footnotes omitted) (emphasis by Counter Defendants).

With respect to the parties' agreements, Counter Defendants assert:

Under the initial Sourcing Agreement, Hubbard was entitled to be paid a commission of "40% of the Gross Margin," with Gross Margin defined as "the profit made by the sale of the Product . . . ." Hubbard's obligation was set out as follows "Contractor agrees to use his knowledge . . . and his best efforts to *provide PPI with access to imported materials* ('Product') *that PPI would be otherwise unable to obtain*." The sales for which Hubbard now claims post-relationship commissions—of product obtained by PPI either directly from suppliers or through other brokers—were obviously not dependent on "access" from Hubbard, nor was PPI "unable to obtain" such product without Hubbard's participation.

The subsequent Sales Compensation Agreement further clarified the Parties' intent on this issue. Paragraph 2 of the Sales Compensation Agreement is entitled "Product procurement services provided by Hubbard" (emphasis added); its text reads as follows: "The gross profit dollars accruing to ORA/PPI *on the subsequent sale of [P]roduct procured by Hubbard* will be split 40% to Hubbard and 60% to ORA/PPI." As agreed, PPI paid Hubbard commissions on sales of [P]roduct that had been procured by Hubbard, even if the raw material was received and/or the sales were consummated after PPI had learned that the faithless Hubbard had surreptitiously acquired and outfitted a new facility and had begun competing with, and attempting to circumvent, PPI by offering to fill customers' orders out of its new facility.

*Id.* at 11-13 (quoting Doc. 113 at 8, 11) (emphasis by Counter Defendants).

Based on the deposition testimony of Joe Hubbard, Counter Defendants further assert that:

Hubbard apparently seeks to rewrite the Parties' contract so as to obligate PPI to pay Hubbard, in perpetuity, commissions on sales of meal obtained from any supplier that Hubbard ever introduced to PPI. Indeed, Charles Hubbard admitted such in explaining his calculation of the $5.8 million in damages:

**Memorandum Opinion and Order – Page 18**

Q.   And is the contention that even though for those products after December of 2020 Hubbard Ingredients didn't arrange for the shipment and procurement of the product from PPI, *it's because it was from a supplier that Hubbard previously introduced*, that's why the commission is being applied?

. . . .

A.   That's right.

Doc. 112 at 13-14 (footnotes omitted) (emphasis by Counter Defendants). Counter Defendants, however, contend that "the Parties' contract did not entitle Hubbard to be paid commissions on every sale made to a supplier that Hubbard *introduced* to PPI," but "instead, the contract—reflected in the Sourcing Agreement as modified by the Sales Compensation Agreement—unambiguously stated that Hubbard was to be paid commissions "on the subsequent sale of [P]roduct *procured by Hubbard*." *Id.* at 14.

Counter Defendants argue that PPI terminated its contractual relationship with Hubbard Ingredients in early 2020 after learning that Hubbard had begun competing with PPI by selling product. Counter Defendants contend that upon learning this and realizing that Hubbard Ingredients did not share PPI's respect for their business relationship, PPI was free to likewise conduct business through suppliers other than Hubbard Ingredients and was "not obligated to pay commission[s] on sales of product *not* 'procured by Hubbard.'"   *Id.* at 14 (emphasis added by Counter Defendants). Counter Defendants thus contend that "Hubbard was not and is not entitled to commissions on such sales." *Id.* at 12.

### 2.   Hubbard Ingredients' Responsive Arguments

In responding to Plaintiff/Counter Defendants' Motion, Hubbard Ingredients first attacks the specificity with which this Motion for Summary Judgment addresses each of the following five causes of action by it: "Account Stated (Count I), Breach of Contract (Count II), the Missouri Commission Sales Act (Count VII), the Texas Sales Representative Act (Count VIII), and Money

Had & Received (Count IX)." Doc. 121 at 22. Hubbard Ingredients contends that Counter Defendants do not analyze how their commissions argument applies to each of these claims. As a result, Hubbard Ingredients argues that it and the court are left to speculate as to which element of each cause of action is implicated.

This argument by Hubbard Ingredients is similar to the one already rejected by the court. Each of the foregoing claims by Hubbard Ingredients is based on the existence or nonexistence of a contract. Moreover, it is apparent that the essence of this argument by Counter Defendants regarding these claims is that each is precluded to the extent that Hubbard Ingredients seeks to recover commissions for product sourced by PPI or someone other than Hubbard Ingredients *because Hubbard Ingredients' entitlement to commissions is governed by the parties' agreements, and the plain language of those agreements only entitles Hubbard Ingredients to commissions for Product it sourced.* Counter Defendants, therefore, argue that, while PPI still owes Hubbard Ingredients some amount for commissions for sales of Product sourced by Hubbard Ingredients on behalf of PPI, Hubbard is not entitled to commissions under the terms of the parties' agreements for sales of product that Hubbard Ingredients did not source. Hubbard Ingredients disagrees and contends that the parties' agreements entitle it to commissions regardless of whether it sourced or procured the product ultimately sold by PPI.

In this regard, Hubbard Ingredients contends that Counter Defendants are not entitled to dismissal of the foregoing claims because: (1) the Sourcing Agreement, which was never terminated by PPI, requires PPI to pay Hubbard Ingredients commissions and includes specific provisions for terminating and modifying the agreement; and (2) the Sourcing Agreement does not preclude commissions or allow PPI to avoid paying Hubbard commissions by sourcing product itself from Hubbard's international suppliers. In addition, Hubbard Ingredients relies heavily on

**Memorandum Opinion and Order – Page 20**

Texas's sales procurement doctrine or "procuring-cause doctrine," contending that this doctrine entitles it to commissions regardless of whether PPI or Hubbard Ingredients sourced product from Hubbard's international suppliers. Hubbard Ingredients, therefore, attempts to downplay and sidestep the express language in the parties' agreements and undercut Counter Defendants' reliance on such language:

> Ironically, Counter[] Defendants cling to the phrase "procured by Hubbard" in the Sales Compensation Plan. They would have been wise to have researched how Texas courts understand procurement, especially in the context of contracts for services compensated by commissions, like the Sourcing Agreement, as modified by the Sales Compensation Plan.

Doc. 121 at 26.

Hubbard Ingredients argues that, because it developed the business relationships with international suppliers that it used to source Product for PPI, these suppliers were Hubbard Ingredients' suppliers, and PPI could not avoid paying commissions by contacting Hubbard's suppliers either directly or indirectly through another agent to source product. According to Hubbard Ingredients, what matters in this situation is that Hubbard "procured the transactions" by "cultivat[ing] relationships with the suppliers, secur[ing] regulatory approval, and develop[ing] the supply chain" through which PPI was able to sell product to its customers and Hubbard Ingredients' customers. *Id.* at 30. Hubbard Ingredients thus asserts that, regardless of what the parties' agreements say about how commissions are earned, its development of a supply chain for the importation of protein meal triggered application of the procuring-cause doctrine, entitling it to commissions on all PPI product sales based on the contractual formula for calculating commissions.

**Memorandum Opinion and Order – Page 21**

### 3. Discussion

#### a. Hubbard Ingredients' Breach of Contract Claim (Count II)

The elements of a breach of contract claim under Texas law are: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (citation omitted). "A breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform." *Case Corp. v. Hi-Class Bus. Sys.*, 184 S.W.3d 760, 669-70 (Tex. App.—Dallas 2005, pet. denied). A breach of contract also occurs when one party to a contract prevents another party to the contract from performing its side of the bargain. *See Texas Nat'l Bank v. Sandia Mortg. Corp.*, 872 F.2d 692, 699 (5th Cir. 1989).

"Texas strongly favors parties' freedom of contract." *Catalyst Strategic Advisors, LLC v. Three Diamond Capital Sbc, LLC*, 93 F.4th 870, 875 (5th Cir. 2024) (quoting *Waste Mgmt. of Tex., Inc. v. Stevenson*, 622 S.W.3d 273, 286 (Tex. 2021)). Under Texas law, contracts involving commissions are interpreted in the same manner as other contracts through use of well-established rules of contract construction. *Perthuis v. Baylor Miraca Genetics Lab'ys, LLC*, 645 S.W.3d 228, 236 (Tex. 2022) (citation omitted). A court's primary concern in interpreting a contract under Texas law is to ascertain the parties' intent. *National Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). Texas courts avoid unreasonable constructions and "construe contracts from a utilitarian standpoint, bearing in mind the particular business activity." *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005). "The language in an agreement is to be given its plain grammatical meaning unless to do so would defeat the parties' intent." *DeWitt Cnty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 101 (Tex. 1999).

When a contract's "language can be given a certain or definite legal meaning or interpretation," courts determine that meaning "as a matter of law." *Perthuis*, 645 S.W.3d at 236 (quoting *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012)). When the terms of a contract are clear and unambiguous, and the facts concerning breach or performance are undisputed or conclusively established, the issue of whether the facts show performance or breach is also decided as a matter of law. *See Meek v. Bishop Peterson & Sharp*, P.C., 919 S.W.2d 805, 808 (Tex. App.—Houston [14th Dist.] 1996, writ denied). A fact issue regarding the parties' intent only arises when the contract's language is found to be ambiguous after application of relevant rules of contract construction. *Perthuis*, 645 S.W.3d at 236 (citation omitted). Judicial interpretations of contracts are "governed by what [the parties] said in [their] contract, not by what one side or the other alleges they intended to say but did not." *Id.* (citation omitted).

"Courts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic evidence to create an ambiguity." *Texas v. American Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006) (applying Texas law). "When a contract contains an ambiguity . . . interpretation of the instrument becomes a fact issue." *See Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1980). The court may only consider parol evidence to determine the parties' intent when an ambiguity exists. *National Union Fire Ins.*, 907 S.W.2d at 520. Parol evidence, however, "is inadmissible to contradict, vary, or add to the terms of an unambiguous written agreement." *Hall v. Hubco, Inc.*, 292 S.W.3d 22 (Tex. App.—Houston [14 Dist.] 2006, pet. denied). Thus, "parol evidence cannot be used to prove another promise not contained in the contract" if such evidence is offered to contradict, vary, or add to the terms of an otherwise unambiguous contract. *Id.*

**Memorandum Opinion and Order – Page 23**

"A fundamental principle of [Texas] contract law is that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform," and its failure to perform cannot be considered a termination or breach of the contract. *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994); *Jack v. State*, 694 S.W.2d 391, 398-99 (Tex. App.–San Antonio 1985, writ ref'd n.r.e.). A party who elects to treat a contract as continuing, however, deprives itself of any excuse for ceasing performance on its own part. *Hanks v. GAB Bus. Servs., Inc.*, 644 S.W.2d 707, 708 (Tex. 1982); *Chilton Ins. Co. v. Pate & Pate Enters., Inc.*, 930 S.W.2d 877, 887 (Tex. App.—San Antonio 1996, writ denied) (concluding that when the nonbreaching party continues to insist on performance by the party in default after the breach, "the previous breach constitutes no excuse for nonperformance on the part of the party not in default and the contract continues in force for the benefit of both parties.").

When one party breaches its contract, the other party must elect whether to continue or cease performance under the contract. *Compass Bank v. MFP Fin. Servs., Inc.*, 152 S.W.3d 844, 858 (Tex. App.—Dallas 2005, pet. denied). Any conduct "indicating an intent to continue will operate as a conclusive choice" but does not deprive the nonbreaching party of its contract claim for the breach that has already taken place. *Id.*; *Gupta v. Eastern Idaho Tumor Inst., Inc.*, 140 S.W.3d 747, 757 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (concluding that, while the nonbreaching party "must elect between continuing or ceasing performance, the election does not affect whether [it] can sue for a former or future breach."). It is deprived only of any excuse for ceasing its own performance under the contract. *Compass Bank*, 152 S.W.3d at 858. Once the "non-breaching party elects to treat the contract as continuing and insists the party in default continue performance, the previous breach constitutes no excuse for nonperformance on the part

**Memorandum Opinion and Order – Page 24**

of the party not in default and the contract continues in force for the benefit of both parties." *Gupta*, 140 S.W.3d at 756.

Whether a breach is material is generally a question of fact. *Mustang Pipeline Co.*, 134 S.W.3d at 196. A breach "is material if the injured party does not receive the substantial benefit of the bargain" under the contract. *Id.* When "it is clear the parties intend that time is of the essence to a contract, timely performance is essential to a party's right to require performance by the other party." *Id.* This is not to say that "in every case, a 'time is of the essence' provision ipso facto makes any delay a material breach." *CFS Forming Structures Co., Inc. v. Flintco, Inc.*, 393 F. App'x 136, 144-45 (5th Cir. 2010). Such a determination instead depends on the facts of each case. *Id.* at 144 (citing and discussing the holding in *Mustang Pipeline Co.*, 134 S.W.3d at 200).

"In determining the materiality of a breach, courts will consider, among other things, the extent to which the nonbreaching party will be deprived of the benefit that it could have reasonably anticipated from full performance." *Hernandez*, 875 S.W.2d at 693. Other factors include:

> (i) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (ii) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (iii) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; (iv) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Id.*

Here, the parties' dispute concerning Hubbard's breach of contract claim turns on their contentions regarding the parties' contractual obligations and whether either Plaintiff or Hubbard breached their respective contractual obligations. The Sourcing Agreement states that PPI engaged Hubbard Ingredients as an independent contractor to perform the services in Exhibit A. The Sourcing Agreement states that Hubbard Ingredients' duties, compensation, and payment are also set forth in Exhibit A, which provides:

**Memorandum Opinion and Order – Page 25**

1. **Duties of Contractor:**
   a. **Contractor agrees to use his knowledge, abilities, professional contacts, his unique expertise in the industry, and his best efforts to provide PPI with access to imported materials ("Product") that PPI would otherwise be unable to obtain**. Such Product includes, by way of example, items such as Brazilian beef, spray-dried salmon, Brazilian salmon meal, South American lamb meal, and items of similar nature.

   b. In the course of assisting PPI in obtaining such Product, Contractor **further agrees to arrange for the inbound and outbound freight of the above Product, and will have such Product delivered to PPI.**

2. Contract Term: There shall be two periods of the term of this Agreement, The Initial Term and the General Term.

   a. Initial Term. The lnitia1 Term of the Agreement shall commence on October 1, 2016, and is characterized as that period of time for which the Contractor's Commission, as defined below, remains less than $6,000.00 per month. In the first month when the Contractor's Commission exceeds $6,000.00, the Initial Term will conclude, and the General Term will commence.

   b. General Term. The General Term shall commence on the first day of the month following the month when the Contractor's Commission exceeds $6,000.00. **The General Term will continue indefinitely until one of the Parties, or both by mutual consent, elect to terminate this Agreement.**

3. **Compensation:**
   a. **The Gross Margin is hereby defined as the profit made by the sale of the Product, less inbound and outbound shipping costs.**

   b. **Contractor's commission will be 40% of the Gross Margin.**

   c. PPI will pay Contractor $6,000.00 per month during the Initial Term, without limitation on the duration of the Initial Term. Thereafter, during the General Term, PPI will pay contractor the Contractor's Commission, described above, on a monthly basis. Contractor will be paid on 1099 basis, and assumes all responsibility for taxes. Contractor agrees to indemnify and hold harmless PPI for any tax liability, if any, that may arise.

Doc. 110 at 12-16 (emphasis added).

The language in the Sourcing Agreement highlighted by the court makes unambiguously clear that the parties agreed Hubbard Ingredients' compensation was premised on: (1) Hubbard's use of industry contacts to provide PPI with Product that it would otherwise be unable to obtain; (2) Hubbard Ingredients' delivery of the sourced Product to PPI; and (3) PPI's sale of the Product sourced by Hubbard Ingredients. For the court to accept Hubbard Ingredients' interpretation of the Sourcing Agreement—as entitling it to payment in the form of commissions for all PPI sales, regardless of whether sales were derived from Product that was sourced or provided and delivered by Hubbard Ingredients—would require the undersigned to ignore the Agreement's definitions of "Gross Margin" and "Product." *See id.* at 16. Specifically, the Sourcing Agreement's definition of "Gross Margin" is a percentage of the profit earned by PPI from "the sale of the Product," and "Product in turn is defined as the meat and fish products that Hubbard provides to PPI. *Id.*

Moreover, the parties' subsequent agreement in the Sales Compensation Plan to split gross profits (40% to Hubbard and 60% to ORA/PPI) for the "sale of product procured by Hubbard" only changed the amount of Hubbard's compensation, not the parties' respective obligations or the basis for Hubbard Ingredients' compensation. The parties also agreed in the Sales Compensation Plan that Hubbard Ingredients would be entitled to an additional 10% on ORA/PPI "sales to customers introduced by Hubbard" with the understanding that Hubbard customers would be primarily serviced with Product sourced by Hubbard Ingredients. Doc. 110 at 18. In this regard, the Sales Compensation Plan only entitled Hubbard Ingredients to an additional 10% if ORA/PPI's sales of Product were to Hubbard Ingredients' customers.

Contrary to Hubbard Ingredients' argument, the Sales Compensation Plan did not require PPI to sell Product sourced by Hubbard Ingredients to Hubbard Ingredients' customers, and neither the Sourcing Agreement nor the Sales Compensation Plan precluded PPI from sourcing product

**Memorandum Opinion and Order – Page 27**

directly from Hubbard's suppliers or from middlemen other than Hubbard Ingredients. Similarly, Plaintiff is incorrect to the extent that it contends that it was entitled to terminate and did terminate the parties' agreements because Hubbard Ingredients starting competing with PPI by cutting out PPI and selling product directly to its own customers.[7] This is so because the parties' agreements contain no exclusivity or noncompetition provisions or other terms that reflect the parties' intentions to work together on an exclusive, noncompetitive basis. Consequently, these theories by the parties do not support their respective positions concerning each side's alleged breaches.

Hubbard Ingredients' contention that it is entitled to compensation under the Sourcing Agreement or the Sales Compensation Plan for doing nothing more than developing its suppliers also fails because it is not supported by the plain language of either agreement. Likewise, its contention that it is entitled to compensation under the Sourcing Agreement or the Sales Compensation Plan for all of PPI's sales, even if the sales were not sales of Product provided by Hubbard Ingredients, is not supported by the terms of these agreements and the parties' intentions as reflected in the agreements. Accordingly, these theories cannot support a breach of contract claim by Hubbard Ingredients against PPI.

Hubbard Ingredients' reliance on Texas's procuring-cause doctrine does not save its flawed breach of contract claim. The procuring-cause doctrine's function is to "credit a broker (or salesman, or other agent) for a commission-generating sale when 'a purchaser [was] produced through [the broker's] efforts, ready, able and willing to buy the property upon the contract terms.'" *Catalyst Strategic Advisors, LLC*, 93 F.4th at 875 (quoting *Perthuis*, 645 S.W.3d at 234). "Under this doctrine, the broker's entitlement to a commission vests on his having *procured* the sale, not on his actual involvement in a sale's execution or continued employment through the final

---

[7] There is also no evidence that Plaintiff terminated the parties' agreements, either in writing as required by the Sourcing Agreement, or verbally.

**Memorandum Opinion and Order – Page 28**

consummation of the sale." *Catalyst Strategic Advisors, LLC*, 93 F.4th at 875 (quoting *Perthuis*, 645 S.W.3d at 234-35).  The doctrine is premised on the idea that, "absent contractual language to the contrary—the contract deems a sale to be the broker's sale if the broker, while under contract with the owner, made the sale possible." *Id.* at 235.  Thus, "commissions are earned and the broker is entitled to . . .  payment according to the contract if, while it is in force, **[it] procures a purchaser to whom the owner directly makes a sale** upon terms which are satisfactory to himself**." *Id.* (emphasis added).

   In *Perthius*, the Texas Supreme Court explained:

> "This is but a rule of fairness and right[.]" . . . After all, when a broker fully complies with his obligations, "the owner receives the full benefit of the broker's effort. **Through the diligence of the broker a buyer is produced." Once a broker performs the task of "[h]aving interested a prospective buyer," an owner cannot deny the broker "a fair opportunity of making a sale to him upon the terms authorized."** Of course, an owner may always "take the matter into his own hands, avail himself of the broker's effort, [and] close a sale upon satisfactory terms," but if he does, the owner's right to "deny the broker's right of compensation, is a proposition not to be countenanced."

*Id.* (internal citations omitted) (emphasis added).

   While the procuring-cause doctrine is a rule of fairness, it is "not a judicially created 'term' for commission contracts, and it does not change how courts interpret such contracts.  Instead, the doctrine:

> does not add anything to a contract or take anything away. It does not restrict parties' ability to modify their contractual relationships and it does not change the law governing whether parties have entered into such a relationship in the first place. Parties certainly may condition the obligation to pay a commission on something other than procuring the sale—they need only say so.

*Perthuis*, 645 S.W.3d at 235.  In other words, the doctrine "provides nothing more than a default rule" that allows courts to ascertain, honor, and enforce the parties' intent as expressed in the text of their contracts." *Id.* at 235-36. Parties remain free to "provide their own rules for paying or

**Memorandum Opinion and Order – Page 29**

withholding commissions" in their contractual agreements. *Id.* at 236. "If they do, the procuring-cause doctrine becomes irrelevant." *Id.* In the absence of "such additional terms," however, "courts will not indulge a party's effort to smuggle in limitations on commission payments that parties could have, but did not, textually express." *Id.* Thus, as a default rule, the procuring-cause doctrine "applies only when a valid agreement to pay a commission does not address questions like how a commission is realized or whether the right to a commission extends to sales closed after the brokerage relationship ends." *Catalyst Strategic Advisors, LLC*, 93 F.4th at 875 (quoting *Perthuis*, 645 S.W.3d at 234).

Unlike *Perthuis* and *Catalyst Strategic Advisors, LLC*, which Hubbard Ingredients relies on, the issue in this case is not whether Hubbard Ingredients is entitled to compensation for procuring a seller or sellers for Plaintiff after the parties' agreements and business relationship was terminated; rather, Hubbard Ingredients argues that it is entitled to compensation beyond that provided in the parties' agreements for a multitude of things not covered by the parties' agreements, including things that have nothing to do with it procuring a seller or sellers for Plaintiff after the parties' agreements and business relationship were terminated.[8]

To the extent that Plaintiff contends that it was entitled to terminate the parties' agreements based on its misconception that Hubbard Ingredients breached by competing with PPI, the court has already explained why this argument fails. From the court's understanding of Plaintiff's arguments, however, Plaintiff does not contend that Hubbard Ingredients is not entitled to or would not have been entitled to compensation if PPI had exercised its right under the Sourcing Agreement

---

[8] The court previously explained that Counter Defendants' argument—that it will provide evidence at trial to support its contention that PPI verbally terminated the parties' agreements—is not summary judgment evidence. It nevertheless determines that a genuine dispute of material fact exists as to whether or when the parties' agreements were voluntarily terminated by either party or as a result of one party's breach such that this issue will need to be resolved by a jury. This is so because there is insufficient information in the summary judgment record regarding the parties' respective performances and conduct, and/or the timing of their actions in relation to one another and performance under the agreements is unclear.

**Memorandum Opinion and Order – Page 30**

to terminate the parties' agreements notwithstanding any alleged breach by Hubbard. Instead, Plaintiff appears to acknowledge that Hubbard Ingredients is entitled to recover moneys owed it in this litigation for sales of Product sourced (provided and delivered to PPI) by Hubbard Ingredients a*s provided for in the parties' agreements*.

Even if this is not Plaintiff's understanding, the court determines that Hubbard Ingredients is entitled to such compensation regardless of whether Plaintiff mistakenly believed that Hubbard Ingredients breached first as a result of its competitive behavior. In any event, the point the court is making here is that the procuring cause doctrine is inapplicable in this case because Hubbard Ingredients procured Product for PPI under the Sourcing Agreement, not buyers, and, although the Sales Compensation Plan allowed Hubbard Ingredients to recover an additional 10% of PPI's sales of Product to Hubbard Ingredients' customers, this situation is already covered by the Sales Compensation Plan.

Further, as noted, the procuring cause doctrine "provides nothing more than a default, which applies only when a valid agreement to pay a commission does not address questions like how a commission is realized or whether the right to a commission extends to sales closed after the brokerage relationship ends." *Perthuis*, 645 S.W.3d at 234. In determining whether the doctrine applies, courts consider whether the terms of the parties' agreement displaced the doctrine. *Id.* Plaintiff contends that the doctrine does not apply because the parties' agreements spell out the actions and events that would need to occur for Hubbard to be entitled to compensation. For the reasons already discussed, the court agrees with Plaintiff and determines that this is another reason for rejecting Hubbard Ingredients' contention regarding the applicability of the procuring cause doctrine in this case. *See Catalyst Strategic Advisors, L.L.C.*, 93 F.4th at 873-74 (distinguishing contractual silence in *Perthuis* and affirming district court's rejection of

**Memorandum Opinion and Order – Page 31**

the procuring cause doctrine because that common law doctrine was displaced by the parties' contract).

Thus, Hubbard Ingredients has failed to raise a genuine dispute of material fact with respect to whether PPI breached the parties' agreements by failing to pay Hubbard Ingredients for commissions on sales of product sourced by PPI, and its breach of contract claim that is premised on this theory and the procuring cause doctrine fails as a matter of law. Counter Defendants are, therefore, entitled to judgment as a matter of law on Hubbard Ingredients' breach of contract claim—*to the extent that it is based on the contention that Hubbard Ingredients is entitled to recover commissions on sales of product sourced by PPI or someone other than it*—and this claim will be dismissed with prejudice.

### b. Hubbard Ingredients' Claims Based On Account Stated, Missouri Commission Sales Act, and Texas Sales Representative Act

Plaintiff next contends that Hubbard Ingredients' counterclaims to recover commissions on PPI sales of product not provided by Hubbard Ingredients to PPI fail for the same reason its breach of contract claim to recover similar damages fails—because such compensation is inconsistent with the parties' agreements. *See* Doc. 112 at 12 & n.31. The court agrees. As Hubbard Ingredients acknowledges, a requirement for causes of action for account stated and alleged violations of the Missouri Commission Sales Act and the Texas Sales Representative Act is failure of a defendant to compensate a plaintiff in accordance with the parties' contract. *See* Doc. 121 at 22 & nn.128-131. As discussed, the parties' Sourcing Agreement and Sales Compensation Plan do not entitle Hubbard Ingredients to compensation on PPI sales of product that was not provided/delivered by Hubbard Ingredients. This is so regardless of whether Plaintiff terminated the parties' agreements or whether either party breached the agreements. Accordingly, the court agrees with Plaintiff that Hubbard's counterclaims based on an account stated theory, the

**Memorandum Opinion and Order – Page 32**

Missouri Commission Sales Act, and the Texas Sales Representative Act to recover commissions *on PPI sales of product not provided by Hubbard Ingredients to PPI* fail as a matter of law and will be dismissed with prejudice.

### c. Hubbard Ingredients Claims For Money Had and Received (and Unjust Enrichment)

Finally, Plaintiff contends that Hubbard Ingredients' Count IX for money had and received to recover commissions on PPI sales of product not provided by Hubbard to PPI fails for similar reasons—"neither the Sourcing Agreement nor the Sales Compensation [Plan] entitle[s] [it] to compensation for sales other than of [P]roduct brokered by Hubbard." Doc. 112 at 12 & n.31.

"A cause of action for money had and received is not premised on wrongdoing, but 'looks only to the justice of the case and inquires whether the defendant has received money which rightfully belongs to another." *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc*., 473 S.W.3d 296, 302 n.4 (Tex. 2015). "Texas courts of appeals have explained that '[t]he quasi-contractual action for money had and received is a cause of action for a debt not evidenced by a written contract between the parties.'" *Villarreal v. First Presidio Bank*, 744 F. App'x 204, 206 (5th Cir. 2018) (quoting *MGA Ins. Co. v. Charles R. Chestnutt, P.C*., 358 S.W.3d 808, 815 (Tex. App.—Dallas 2012, no pet.)). Thus, money had and received is not premised on the existence of a contract, but rather on the equities involved when one party receives money that, in equity or good conscience, belongs to another party.

When, as here, "a valid contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory" such as money had and received. *ConocoPhillips Company v. Koopmann*, 542 S.W.3d 643, 663 (Tex. App.—Corpus Christi, 2016), *aff'd on other grounds by ConocoPhillips Company v. Koopmann*, 547 S.W.3d 858 (Tex. 2018); *see also Payne v. Wells Fargo Bank Nat'l Ass'n* 637 F. App'x 833, 838 (5th Cir. 2016) ("[T]he existence of an

express contract precludes equitable relief under the theory of money had and received.") (quoting *TIB–The Indep. BankersBank v. Canyon Comty. Bank*, 13 F. Supp. 3d 661, 671-72 (N.D. Tex. 2014) (citing *Texas Star Motors, Inc. v. Regal Fin. Co.*, 401 S.W.3d 190, 202 (Tex. App.—Houston [14th Dist.] Jan., 10, 2012, no pet.)). The same rule applies when a party seeks to recover under an equitable quasi contract-theory of unjust enrichment. *ConocoPhillips Company*, 542 S.W.3d at 663 (citing *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000)). Accordingly, "when a party claims that it is owed more than the payments called for under a contract, there can be no recovery for unjust enrichment if the same subject is covered by [the] express contract." *Id.* at 684 (citations and internal quotations marks omitted).

Here, neither party contends that the parties' agreements are not valid, enforceable, or binding. Moreover, as Plaintiff correctly notes, Hubbard Ingredients' counterclaim for money had and received fails because the parties' agreements cover the manner in which and the extent to which Hubbard Ingredients would be compensated. The parties could have agreed to compensate Hubbard simply for access to its industry supply sources, but they did not do so. Similarly, the parties could have chosen to compensate Hubbard for all sales by PPI, regardless of whether product was sourced and delivered by Hubbard to PPI, but they did not do so. Instead, the parties agreed to compensate Hubbard Ingredients based on a percentage of PPI's sales of the Product provided and delivered by Hubbard Ingredients to PPI, and they agreed that Hubbard Ingredients would be entitled to an additional 10% if PPI's sales of Product were to Hubbard Ingredients' customers.

Thus, Hubbard Ingredients cannot now alter the negotiated terms of the parties' agreements via quasi-contract theories of recovery in an attempt to increase the compensation owed it by PPI. The court, therefore, agrees with Plaintiff that Hubbard Ingredients would only be entitled to

recover on this ground if the court rewrote the parties' agreements, which it cannot and will not do. Moreover, Hubbard has not pointed to any evidence that the equities involved would entitle it to compensation other than that agreed to by the parties. Plaintiff is, therefore, entitled to judgment as a matter of law on Hubbard Ingredients' equitable claim of money had and received. Hubbard Ingredients' unjust enrichment claim fails for the same reason; however, because neither party mentions this claim in their briefing, the court declines to dismiss it at this time on this ground.

### C. Hubbard Ingredients' Claims for Fraud and Negligent Misrepresentation (Counts III and IV)

Counter Defendants contend that they are entitled to summary judgment on Hubbard Ingredients' fraudulent and negligent misrepresentation claims because they are impermissible "contort" claims in that Counter Defendants' alleged conduct (misrepresentations) does not give rise to liability independent of the fact that one or more contracts exist between them. Doc. 112 at 15 (quoting *Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493 (Tex. 1991)). Counter Defendants, therefore, argue that the parties' relationship was purely contractual and any liability by them stems from the parties' agreements. For support, Counter Defendants also point to several representations allegedly made by them during the course of the parties' business relationship, which Counter Defendants contend pertain to their performance under the agreements.

Hubbard Ingredients counters that the economic loss rule does not bar claims for fraud or negligent misrepresentation, and it points to evidence that it contends falls outside of the parties' contractual obligations:

> Counter [Defendants] had a duty to make honest statements to Hubbard Ingredients, which included (i) statements about their tracking and consideration of data underlying the calculation of Gross Margin and their actual Gross Margin calculation; and (ii) their statements about their decision to cease paying commissions to Hubbard Ingredients. This duty is independent of their duty to pay commissions under the Sourcing Agreement, as modified by the Sales Compensation Plan. "A duty not to commit fraud is not created by contract, but is

instead 'a duty imposed by' the common law of Texas." "[P]arties to a contract have an independent legal duty not to commit the intentional tort of fraud." "Even if the matter in dispute is the subject of a contract, a party may elect a recovery in tort if the duty breached stands independent from the contractual undertaking, and the alleged damages are not solely the result of a bargained-for contractual benefit."

Doc. 32-34 (quoting *Chapman Custom Homes, Inc. v. Dall. Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014), for the conclusion that "[t]he economic loss rule generally precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy"; and quoting *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986), for the conclusion that "[w]hen the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone.").

Instead of focusing on Hubbard Ingredients' economic loss rule arguments, Counter Defendants argue for the first time in their reply brief that their summary judgment motion is not based on their termination of the parties' contractual relationship, but they will present evidence at trial, if necessary, that "Collin Harwell did terminate the parties' agreements (except as to subsequent shipments fulfilling existing commitments) by telling Joseph Hubbard in an early 2020 phone call that Hubbard Ingredients' conduct was 'going to destroy and end this relationship." Doc. 136 at 20. They, nevertheless, acknowledge that Hubbard disputes whether this was an effective termination of the parties' agreements.

It is not clear how this contention is relevant to Hubbard's economic loss rule argument. Regardless, the court determines that the arguments raised by the parties with respect to Hubbard Ingredients' claims for fraud and negligent misrepresentation are not adequately briefed. Thus, although the court has some concerns as to whether Hubbard Ingredients' "injury is only the economic loss to the subject of a contract itself," it leaves the resolution of this issue for another

**Memorandum Opinion and Order – Page 36**

time, as it determines that Counter Defendants' Motion for Summary Judgment as to these claims should be denied.

### D. Hubbard Ingredients' Claims for Intentional Interference With Contract and Business Relationships—Hubbard's Suppliers (Count V)

The essential elements of a tortious-interference-with-a-contract claim are: (1) the existence of a contract subject to interference; (2) the occurrence of an act of interference that was willful and intentional; (3) the act was a proximate cause of the plaintiff's damage; and (4) that actual damage or loss occurred. *Holloway v. Skinner*, 898 S.W.2d 793, 795-96 (Tex. 1995).

Counter Defendants argue that Hubbard Ingredients' claim for intentional interference with contract and business relations in connection with its suppliers fails under Texas law because Hubbard Ingredients did not have existing contracts with its suppliers of pet meal.  In this regard, Counter Defendants argue that, while Joseph Hubbard testified that he personally had contracts with suppliers, he admitted that Hubbard Ingredients, the party asserting this claim, did not have any contracts with suppliers as required to support a claim under Texas law.

Additionally, Counter Defendants contend that lawful competition on their part, which was not prohibited by the parties' agreements, does not constitute actionable tortious interference. Doc. 112 at 19 (quoting *Wal-Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 713, 726 (Tex. 2001)), for the conclusion that:

> to establish liability for interference with a prospective contractual or business relation the plaintiff must prove that it was harmed by the defendant's conduct that was either independently tortious or unlawful. . . . By independently tortious we do not mean that the plaintiff must be able to prove an independent tort. Rather, we mean only that the plaintiff must prove that the defendant's conduct would be actionable under a recognized tort.

*Id.* at 726.  Based on *Sturges*, Counter Defendants contend that:

> The Texas Supreme Court went on to identify two types of conduct that would satisfy the "independently tortious" requirement and support liability for tortious

> interference: "a defendant who makes fraudulent statements about the plaintiff to a third person" or an illegal boycott. *Id.* at 726. Indeed, "[c]onduct that is merely 'sharp' or unfair is not actionable and cannot be the basis for an action for tortious interference with prospective relations . . . ." *Id.*

Doc. 112 at 20 (quoting *Sturges,* 52 S.W.3d at 713 & 726).

Counter Defendants argue that its alleged conduct does not rise to the level required by the Texas Supreme Court in *Sturges* because, although Mr. Hubbard testified that Hubbard Ingredients had to pay higher prices as a result of PPI's competition, "PPI's act of purchasing from suppliers was neither independently tortious [nor] wrongful" and does not constitute the type of conduct required to support a tortious interference claim. Doc. 112 at 21.

Hubbard Ingredients responds that Counter Defendants' reliance on Mr. Hubbard's deposition testimony is misplaced because other evidence shows that "they understood that Hubbard Ingredients had exclusive relationships with the international suppliers and that Hubbard Ingredients was the third-party beneficiary of the supply chain agreements." Doc. 121 at 44.

To this, Counter Defendants reply that Hubbard Ingredients has not come forward with evidence that it was harmed from PPI's alleged interference with Hubbard's business relations with its suppliers:

> To illustrate its claim for interference with business relations, Hubbard Ingredients expends pages of its Memorandum describing PPI's ultimately-unsuccessful attempts to persuade supplier Seara to follow through on its commitments to ship meal.44 The choice of Seara as an example is curious; as is shown by Hubbard Ingredients' extended discussion, Seara—at the urging of Hubbard Ingredients—refused to continue doing business with PPI, even declining to finish out the remainder of its unfilled annual commitment.

> More importantly, the reality remains that even as to suppliers with whom PPI was able to maintain its relationships without Hubbard Ingredients' brokerage assistance, PPI did not displace Hubbard Ingredients as a purchaser from those suppliers, or cause suppliers to cease doing business with Hubbard Ingredients. At trial, if necessary, Collin Harwell will testify that in late 2020 he believed that PPI did not have a contract with Hubbard Ingredients, having terminated that contract earlier in the year. But it should never come to that; whether styled as tortious

**Memorandum Opinion and Order – Page 38**

interference with a contract or with supplier relationships, this trumped-up $3,057,625.84 claim fails as a matter of law.

Doc. 136 at 17-18.

The court determines that a genuine dispute of material fact exists regarding the first two elements of this claim: (1) existence of a contract subject to interference; and (2) the occurrence of an act of interference that was willful and intentional.  While Counter Defendants also argue that Hubbard Ingredients has no evidence of harm or damages, this new argument was raised for the first time in Counter Defendants' reply brief.  The court, therefore, declines to consider it in ruling on Counter Defendants' Motion for Summary Judgment.  *See Perez v. Bruister*, 823 F.3d 250, 273 n.31 (5th Cir. 2016) (explaining that arguments made for the first time in a reply are not appropriate for consideration by the court).  Accordingly, Counter Defendants request to dismiss this claim will be denied.

### E. Hubbard Ingredients' Claims for Intentional Interference With Contract and Business Relationships—Hubbard's Customers (Count VI)

With respect to Hubbard Ingredients' claim for intentional interference with contract and business relations in connection with its customers, Counter Defendants assert in a footnote as follows:

> In Count VI Hubbard addresses customer sales, asserting that Hubbard "cultivated sales customer relationships with pet food manufacturers" (Counterclaim, Count VI, ¶ 111) and complaining that "Counter[] Defendants began selling directly to the customer without the knowledge of Hubbard Ingredients . . . ." (*Id.* ¶ 117). However, Hubbard did not, in its Amended Disclosures or in the subsequent deposition of its damage's expert Charles Hubbard, identify any damages supposedly suffered by virtue of Counter[] Defendants competing for sales to pet food manufacturers; Hubbard presumably has abandoned its claim for tortious interference with its relationships with customers.

Doc. 112 at 17 n.41.  In a subsequent footnote, Counter Defendants further assert:

> If it were necessary, Counter[] Defendants would show that Count VI—for supposed interference with contracts or relations with pet food manufacturers

(customers)—is also legally deficient. At most, PPI is now engaged in lawful competition with Hubbard Ingredients to sell to manufacturers, and Hubbard Ingredients' Rule 30[(b)(6)] representative Joseph Hubbard admitted that Hubbard Ingredients does not have exclusivity with any customer. J. Hubbard Dep[.] at 30:11-18. However, Counter-Plaintiff Hubbard Ingredients has apparently abandoned Count VI, failing to support it with any disclosure or testimony of damage from lost sales to, or reduced prices charged to, customers.

Doc. 112 at 22 n.50.

Hubbard Ingredients responds that this argument by Counter Defendants is not adequately briefed because their Motion for Summary Judgment does not set forth all of the elements for this action (or other actions). Hubbard Ingredients, therefore, contends that Counter Defendants' Motion for Summary Judgment should be denied.

While Hubbard Ingredients' response addresses in detail its claim for intentional interference with contract and business relationships as it pertains to its suppliers (Count V), its response says little or nothing regarding this claim as it pertains to PPI's alleged interference with Hubbard Ingredients' customers (Count VI). The court agrees that Counter Defendants' argument with respect to this claim does not comply with this District's Local Civil Rules for summary judgment practice and briefing. Counter Defendants do, however, identify the element of this claim for which they contend evidence is lacking, and that element is damages.

Hubbard Ingredients does not dispute that damages is an element of this claim. *See* Doc. 121 at 44 n.250 (setting forth the elements under Texas law for a claim of tortious interference with an existing business relationship). It, instead, contends that it "pleaded that it sustained such monetary damages in the Counterclaim." Doc. 121 at 44 n.250 (citing Doc. 33 ¶ 93). In addition, Hubbard contends that Counter Defendants "neglected to ask about these damages, much less foreclose them, during its deposition of Hubbard Ingredients' corporate representative." *Id.* This argument by Hubbard Ingredients, though, does not address Counter Defendants' contention

regarding the lack of evidence supporting Count VI. As the nonmovant, it was Hubbard summary judgment burden to come forward with evidence regarding this element because at the summary judgment stage it can no longer rely on its pleadings. Hubbard Ingredients, therefore, waived this **issue** and, in doing so, it failed to raise a genuine dispute of material fact regarding the damages elements of this claim. As such, Counter Defendants are entitled to judgment as a matter of law on this claim, which will be dismissed with prejudice.

## IV.    Hubbard Ingredients' Motion Regarding Plaintiff's Claims and Its Counterclaims

Defendants move for summary judgment on Plaintiff's legal and equitable claims for: (1) breach of contract; money had and received; unjust enrichment; breach of fiduciary duty; and fraud. Defendants also contend that they are entitled to summary judgment on their own claims for breach of contract (Count II); account stated (Count I); and money had and received and unjust enrichment (Count IX).

### A. Plaintiff's Claims

#### 1. Breach of Contract and Breach of Fiduciary Duty

In responding to Defendants' Motion regarding its claims for breach of contract and breach of fiduciary duty, Plaintiff advised that it was withdrawing these claims. Defendants argue that, given Plaintiff's decision to withdraw these claims late in the litigation, they should be dismissed with prejudice. The court agrees with Defendants.

A plaintiff's failure to pursue or defend a claim beyond the party's initial complaint constitutes abandonment of the claim, which cannot thereafter be resurrected. The court, therefore, determines that Plaintiff **abandoned** its claims for breach of contract and breach of fiduciary duty. *Black v. North Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (plaintiff abandoned retaliatory abandonment claim when she failed to defend claim in response to motion to dismiss);

*Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1164 (5th Cir. 1983) (explaining that a party "in . . . opposition to a motion for summary judgment cannot abandon an issue and then . . . by drawing on the pleadings resurrect the abandoned issue"). As Plaintiff has abandoned its causes of action for breach of contract and breach of fiduciary duty, they cannot be later resurrected. Accordingly, the court agrees that Defendants are entitled to judgment as a matter of law on these claims, which will be dismissed with prejudice.

### 2. Money Had and Received and Unjust Enrichment (Against Hubbard Ingredients and Integrated Proteins)

Defendants contend that Plaintiff's equitable claims for unjust enrichment and money had and received fail as a matter of law because they are premised on and subsumed into PPI's breach of contract claim. Defendants assert that it is well established under Texas law that "whe[n] an adequate and complete remedy at law is provided, [Texas] courts . . . will not grant equitable relief" because, "when a written contract unambiguously covers the subject matter of the parties' dispute . . . the express-contract rule bars recovery in [equity] as a matter of law." Doc. 109 at 23 (citations and footnotes omitted).

Defendants, alternatively or in addition, contend that Plaintiff's equitable claims for money had and received and unjust enrichment fail because they are based on PPI's allegations that Hubbard Ingredients and Integrated Proteins "hold money that was ill-gotten, specifically money from sales of meal to identified customers of the Joint Venture," and PPI's request for relief in the form of disgorgement of "all payments they have received from selling product to the customers that Plaintiff was to supply under the terms of the Joint Venture." *Id.* at 23-25 (quoting Doc. 31 ¶¶ 54, 59). Defendants argue that no such joint venture or contractual obligation exists that requires Hubbard Ingredients or Integrated Proteins to fulfill "any orders, much less all orders through PPI." Doc. 109 at 23. In addition, Defendants argue that there is no evidence they

Memorandum Opinion and Order – Page 42

"obtained a benefit *from Plaintiff* or that any 'fraud, duress, or . . . undue advantage' caused [them] to become [unjustly] enriched." *Id.* at 25 (emphasis by Defendants).

Counter Defendants respond that their equitable claims for unjust enrichment and money had and received are based on Hubbard Ingredients' conduct that is separate and apart from the parties' obligations under their agreements. Based on the declaration of Collin Harwell, Counter Defendants assert:

> For instance, in late 2019, Hubbard Ingredients brokered a major supply contract for PPI to provide turkey meal to pet food manufacturer ANI/Alphia throughout 2020. Based on Hubbard Ingredients' representations, PPI projected the need for 16 truckloads per month and purchased the necessary turkey meal from suppliers. Relying on Hubbard Ingredients' assurances, PPI incurred substantial costs to secure the inventory.

> Unbeknownst to PPI, Hubbard Ingredients and its affiliate Integrated Proteins devised a scheme to divert the benefits of the ANI/Alphia contract for themselves. By mid-2020, Hubbard Ingredients began informing ANI/Alphia that future shipments would come directly from Hubbard Ingredients' new facility in Purdy, Missouri, rather than from PPI's Texas facilities. Hubbard Ingredients covertly instructed ANI/Alphia to switch purchase order numbers, ensuring that payments went to Integrated Proteins instead of PPI, and as such collected money which, in good equity and conscious should have been remitted to PPI upon PPI's fulfilling of the orders.

> This was not a standalone incident, but rather part of a calculated scheme. In a telling July 2019 email to a PPI customer, Ty Christiansen from Integrated Proteins detailed Defendants' plan to redirect the execution of contracts, and thus purchases of protein meal, away from PPI to Integrated Proteins, as soon as it completed [it]s new facility in Southwestern Missouri by year-end 2019. This contemporaneous communication clearly indicates a strategic effort to undermine PPI and divert profits to Integrated Proteins.

Doc. 142 at 13-14 (footnotes omitted).

Hubbard Ingredients' competitive conduct alone is not sufficient to support equitable claims for unjust enrichment and money had and received; however, because Counter Defendants have come forward with evidence that Hubbard Ingredients' misled them into believing that a large amount of turkey meal would be needed to fulfill sales to

**Memorandum Opinion and Order – Page 43**

Hubbard Ingredients' customers, and evidence that it incurred damages in connection with this turkey meal when Hubbard Ingredients directed those sales away from PPI, the court determines that Counter Defendants' evidence is sufficient to raise a genuine dispute of material fact on the matters raised by Defendants. Defendants' Motion for Summary Judgment as to these claims will, therefore, be denied.

### 3. Fraud Claims (Against Hubbard Ingredients and Joseph Hubbard)

Defendants contend that they are entitled to judgment as a matter of law on Counter Defendants' fraud-based claims because: (1) they are barred by the economic loss rule; (2) and PPI's pleadings fail to establish all elements of its claims for fraud and fraud by nondisclosure.

Except for one alleged omission, Defendants contend that all of PPI's fraud claims boil down to the following: "(1) Hubbard Ingredients promised to service all sales it made to its customers through PPI, but did not; (2) Hubbard Ingredients promised to not compete with PPI, but did; and (3) Hubbard Ingredients never told PPI that Hubbard Ingredients was operating its own facility or servicing sales to its customer[s] but should have." Doc. 109 at 31. Defendants argue that, whether they were required to perform or refrain from performing these specific actions can only emanate from the parties' agreements, and Counter Defendants cannot reform the parties' agreements by claiming now that Hubbard made oral promises that are not reflected in their agreements. Defendants, therefore, contend that such fraud claims by Plaintiff are barred by Texas's economic loss rule. Doc. 31-32 (citing *Jim Walter Homes, Inc.*, 711 S.W.2d at 618, for the conclusion that "[w]hen the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone.").

Counter Defendants respond in pertinent part and provide evidence to support the following argument:

PPI contends and will present evidence that, given the parties' course of dealing, Hubbard Ingredients' informing PPI of the impending sale and brokering of the purchase of the corresponding volume of protein meal constituted a representation that Hubbard Ingredients would fulfill the order with meal from PPI's Navarro County facility. And PPI relied on Hubbard Ingredients' representations by purchasing thousands of tons of protein meal from Hubbard Ingredients' suppliers. In the alternative, PPI contends that because of that past pattern and practice and the relationship between the parties, Hubbard Ingredients' silence about its new facility and its real intentions contravened a duty to speak—to candidly inform PPI that Hubbard Ingredients intended to displace PPI for the ultimate sale of the product.

. . . .

Here, the conduct of which PPI complains—misrepresenting, and failing to disclose, Hubbard's intentions with respect to orders brokered by Hubbard Ingredients ostensibly for sale by PPI—did not arise out of, or violate, an express obligation under the parties' contract; PPI concedes that Hubbard Ingredients' contractual obligations, under the so-called Sourcing Agreement as modified by the Sales Compensation Agreement, did not include exclusivity in fulfilling orders for meal. Hubbard Ingredients' implicit representation that manufacturers' orders identified by Hubbard Ingredients—triggering PPI's orders of meal from suppliers—would be filled out of PPI's facilities with PPI's inventory, were extra-contractual.

Likewise, the losses suffered by PPI were not the subject of the parties' contract. Under and through that contract, PPI made (and shared with Hubbard Ingredients) profits on the difference between the cost of goods sold—the price paid for protein meal under the supply contracts brokered by Hubbard Ingredients—and the sale prices for that protein meal. PPI is not seeking damages for lost profits. Rather, PPI claims damages resulting from sales of meal ordered at Hubbard's behalf, at below-cost prices necessitated by Hubbard's supplanting PPI as the seller.

Doc. 142 at 15-20. Counter Defendants, therefore, assert that Defendants had a duty to speak and their fraud claim based on such a duty does not run afoul of the economic loss rule. *Id.* at 20 (citing *Lewis v. Bank of Am. NA*, 347 F.3d 587, 588 (5th Cir. 2003); and *North Tex. Opportunity Fund L.P. v. Hammerman & Gainer Int'l, Inc.*, 107 F. Supp. 3d 620, 633 (N.D. Tex. 2015)).

To prevail on a fraud claim, a plaintiff must show: (1) the defendant made a material representation that was false; (2) the defendant knew the representation was false or made it

recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and suffered injury as a result. *JPMorgan Chase Bank, N.A. v. Orca Assets G.P.*, 546 S.W.3d 648, 653 (Tex. 2018).

In contrast, to prevail on a claim of fraud by non-disclosure, a sub-category of fraud, the plaintiff must show: (1) the defendant failed to disclose material facts to the plaintiff that the defendant had a duty to disclose; (2) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts; (3) the defendant was deliberately silent when the defendant had a duty to speak; (4) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting; (5) the plaintiff relied on the defendant's nondisclosure; and (6) the plaintiff was injured as a result of acting without that knowledge. *White v. Zhou Pei*, 452 S.W.3d 527, 537 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *see also Guevara v. Lackner*, 447 S.W.3d 566, 578 (Tex. App.—Corpus Christi–Edinburg, 2014 no pet.) ("Fraud by omission or non-disclosure is another subcategory of fraud because an omission or non-disclosure may be as misleading as a positive misrepresentation of fact where a party has a duty to disclose."). The concealed information must be material to support a claim for fraud by nondisclosure. *Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001). Information is considered "material" if it is such that a reasonable person would attach importance to it and would be induced to act on it in determining his choice of actions in the matter. *Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 478-79 (Tex. App.—Fort Worth 2004, no pet.) (citation omitted).

A duty to disclose arises when: (1) "the parties have a confidential or fiduciary relationship; (2) "one party voluntarily discloses information, which gives rise to the duty to disclose the whole

**Memorandum Opinion and Order – Page 46**

truth"; (3) "one party makes a representation, which gives rise to the duty to disclose new information that the party is aware makes the earlier representation misleading or untrue"; or (4) " one party makes a partial disclosure and conveys a false impression, which gives rise to a duty to speak." *White*, 452 S.W.3d at 537 (citations omitted). The existence of a duty to disclose is decided by the court as a matter of law. *Bradford*, 48 S.W.3d at 755.

The court agrees that Counter Defendants' evidence regarding the initial representations by Defendants to PPI regarding the quantity of turkey meal needed by PPI to fulfill upcoming orders that Hubbard Ingredients secured is sufficient to raise a genuine dispute of material fact as to whether such representations gave rise to a subsequent duty for Defendants to speak when they realized that their prior statements in this regard conveyed a false impression and were misleading, especially given their knowledge that PPI had purchased the large quantities of turkey meal from Hubbard in reliance on Hubbard's prior representations. The court also agrees with Counter Defendants that neither this conduct by Defendants nor the injuries suffered by Counter Defendants as a result of Defendants' misrepresenting and/or failing to disclose its intentions with respect to orders brokered by Hubbard Ingredients ostensibly for sale by PPI—stem from the parties' agreements or the parties' obligations under those agreements. Accordingly, Plaintiff's fraud claims based on this theory are not barred by the economic loss rule, and Defendants are not entitled to dismissal of this claim.

Defendants next contend that PPI's fraud by nondisclosure claim—based on Hubbard Ingredients' failure to disclose that Integrated Proteins was being formed and would be making sales rather than having the sales come out of PPI's facility—fails as a matter of law because Hubbard Ingredients had no duty to speak, PPI did not rely on this alleged omission, and it suffered no damages because, when deposed, Collin Harwell admitted that PPI did not take any action in

reliance on the omission, such as building a new facility.  Hubbard notes that Collin Harwell also identified another omission pertaining to Defendants not informing PPI that certain sales would be fulfilled with domestic supply, but he similarly admitted that PPI suffered no damages as a result. Hubbard, therefore, asserts that it is entitled to judgment as a matter of law on any fraud by nondisclosure claims by PPI in this regard.

As Counter Defendants do not address these specific arguments by Defendants, the court determines that they **abandoned** any fraud by nondisclosure claims by them based on Defendants' failure to disclose that Integrated Proteins was being formed and would be making sales rather than having the sales come out of PPI's facility; and Defendants' failure to inform PPI that certain sales would be fulfilled with domestic supply. *Black*, 461 F.3d at 588 n.1; *Hargrave*, 710 F.2d at 1164.  These claims will, therefore, be dismissed with prejudice.

### B.  Hubbard Ingredients' Counterclaims

As the summary judgment movant on its own counterclaims on which it has the burden of proof, Hubbard Ingredients must do more than raise a genuine dispute of material fact with respect to these claims. As explained, it "must establish beyond peradventure *all* of the essential elements of [its] claim[s.]'" *Fontenot*, 780 F.2d at 1194. The "beyond peradventure" standard is, therefore, considered a "heavy" standard to meet. *Carolina Cas. Ins. Co. v. Sowell*, 603 F. Supp. 2d 914, 923-24 (N.D. Tex. 2009) (citation omitted); *see also Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021) (explaining that, when the movant has the burden of proof at trial, its summary judgment "burden is even higher; [it] 'must establish beyond peradventure all of the essential elements of the claim.'") (quoting *Fontenot*, 780 F.2d at 1194).

Moreover, as the court has already determined that PPI is entitled to judgment as a matter of law on these claims as a result of Hubbard Ingredients' failure to raise a genuine dispute of

**Memorandum Opinion and Order – Page 48**

material fact in responding to PPI's Motion, it would be inconsistent for the court to conclude in addressing Defendants' Motion regarding these same counterclaims that Hubbard Ingredients is entitled to judgment as a matter of law on its counterclaims that are based on the legal and equitable theories of breach of contract against PPI with respect to product sourced by PPI (Count II), account stated against PPI (Count I), and money had and received or unjust enrichment (Count IX). Defendants' Motion with respect to these counterclaims will, therefore, be denied.

This leaves only Hubbard Ingredients' contention that it is entitled to judgment on its breach of contract claim to the extent it is based on Product sourced by it. In support of this claim, Defendants contend that it is undisputed that: (1) it tendered performance under the Sourcing Agreement as modified by the Sales Compensation Plan; (2) PPI breached the Sourcing Agreement by miscalculating commissions and, eventually, ceasing to pay commissions entirely on the mistaken belief that its performance was relieved by a breach by Hubbard Ingredients; (3) even if Hubbard Ingredients breached, PPI waived any right to nonperformance by continuing to seek and secure Hubbard Ingredients' performance after the first quarter of 2020; and (3) PPI did not provide written notice of its intent to terminate the parties' agreements.

Counter Defendants' response to Defendants' Motion for Summary Judgment on its breach of contract claim focuses on Defendants' argument that it is entitled to commissions for product sourced by PPI.  On the other hand, although Counter Defendants continue to dispute whether its termination of the parties' agreements was effective, they appear to acknowledge that Hubbard Ingredients is entitled to compensation for Product sourced by Hubbard and sold by PPI.  For this reason—and because Hubbard has satisfied its burden of establishing that it performed under the parties' agreements; that PPI failed to perform; that PPI's alleged verbal termination was not effective; and, even if terminated, that PPI continued to perform under the agreements; and PPI

**Memorandum Opinion and Order – Page 49**

has not shown that Hubbard breached its obligations under the agreements—the court determines that Hubbard is entitled to judgment as a matter of law on its breach of contract claim *with respect to liability to the extent it is based on PPI's breach of the Sourcing Agreement and Sales Compensation Plan by miscalculating Hubbard Ingredients' commissions and, eventually, ceasing to pay commissions entirely on the mistaken belief that its performance was relieved by a breach by Hubbard Ingredients*. The amount of damages that Hubbard Ingredients is entitled to recover on this claim, however, remains for trial.

## V.    Conclusion

For the reasons explained, the court **grants in part and denies in part** Defendants' Motion (Doc. 108) and **grants in part and denies in part** Plaintiff's and Counter Defendants' Motion (Doc. 111).

The following claims by Plaintiff are **dismissed with prejudice**: breach of contract; breach of fiduciary duty; and Plaintiff's fraud by nondisclosure claims to the extent based on Defendants' failure to disclose that Integrated Proteins was being formed and would be making sales rather than having the sales come out of PPI's facility, and Defendants' failure to inform PPI that certain sales would be fulfilled with domestic supply.

The following claims by Hubbard Ingredients are also **dismissed with prejudice**: breach of contract (Count II) based on PPI sourced product; account stated (Count I); Missouri Commission Sales Act violations (Count VII); Texas Sales Representative Act violations (Count VIII); intentional interference with contract and business relations—based on Hubbard's customers (Count VI); and money had and received (Count IX).

As a result of the court's rulings on the parties' Motions, the following claims remain for trial: Hubbard Ingredients' breach of contract claim (Count II) based on Product sourced and

delivered by Hubbard to PPI;[9] Hubbard Ingredients' claims for fraud and negligent misrepresentation; Hubbard Ingredients' claim for intentional interference with contract and business relations—based on Hubbard's suppliers (Count V); Hubbard Ingredients' claim for unjust enrichment (Count IX); Plaintiff's unjust enrichment and money had and received claims; and Plaintiff's claims for fraud and fraud by nondisclosure claim that are based on Defendants' misrepresentations and/or failure to disclose facts concerning the quantity of turkey meal needed by PPI to fulfill upcoming orders that Hubbard Ingredient secured. Counter Defendants did not move for summary judgment on Hubbard Ingredients' counterclaim for violations of the Texas Theft Liability Act against PPI (Count X), so this claim also remains for trial.

By separate order, the court will reset the trial of this case and all unexpired deadlines.[10] In the meantime, as the court has significantly reduced the number of claims in this action, it strongly encourages the parties to reassess their respective positions and confer again before commencement of the trial to determine whether a settlement of the parties' remaining respective claims can be reached, particularly since this is not an "open-and-shut" case for either side. This action is fact-intensive and involves the credibility of witnesses. The court is not clairvoyant and cannot predict how a jury will decide the issues presented. Moreover, if the parties choose to try their remaining claims, they will likely continue to incur handsome legal fees through trial and any

---

[9] In ruling on Defendants' Motion for Summary Judgment, the court concluded that Hubbard Ingredients was entitled to judgment as a matter of law on its breach of contract claim *with respect to liability* to the extent the claim is based on PPI's breach of the Sourcing Agreement and Sales Compensation Plan by miscalculating Hubbard Ingredients' commissions and, eventually, ceasing to pay commissions entirely on the mistaken belief that its performance was relieved by a breach by Hubbard Ingredients. Only the amount of damages that Hubbard Ingredients is entitled to recover on this claim remains for trial. To the extent that Hubbard Ingredients asserts a claim for breach of contract on the other grounds listed *supra* at pages 4-5 for which neither party moved for summary judgment, those claims also remain for trial. Thus, the breach of contract claims based on the grounds summarized on these pages at (ii)-(vi) and (ix)-(xiii) remain.

[10] The court is aware that Counter Defendants filed a handful of motions after the court vacated the trial of this case pending resolution of the parties' summary judgment motions. The court intends to deny these motions and will rule on them in a separate order.

**Memorandum Opinion and Order – Page 51**

appeal. Given the uncertainty of the outcome of the remaining claims and the time this case has been pending, it behooves the parties to vigorously seek resolution of this action without further court involvement, except to the extent stated below.  In other words, it is time for the parties to "fish or cut bait." The court also reminds the parties that all civil trial settings are subject to the priority of criminal trials established by the Speedy Trial Act, 18 U.S.C. §§ 3161-3174. For these reasons and given the limited availability on its current busy trial docket, the court may not be able to try this case until sometime in early 2027 if the parties are unable to settle their remaining claims.

To facilitate resolution of the parties' remaining claims, the court will make available a magistrate judge (at no cost to the parties) to conduct a mediation or settlement conference if the parties are amenable to further settlement discussions. If, after serious discussion (and potentially after mediation or a settlement conference), the parties are unable to resolve their differences, the court will set this matter for trial. The parties **shall file** a joint notification by **April 24, 2026**, informing the court whether they are able to resolve the parties' remaining respective claims in this action without further court involvement *or* desire to participate in a settlement conference or mediation with a magistrate judge at no cost. The court will reset the trial of this case by separate order, as necessary, once it hears from the parties.  As all pretrial materials have been filed, it will not allow the parties to amend these materials or file new pretrial materials absent good cause and leave of court, particularly if doing so would unnecessarily delay the resolution of this litigation.

**It is so ordered** this 17th day of April, 2026.

Sam A. Lindsay
United States District Judge

**Memorandum Opinion and Order – Page 52**